**MAJOR'S FURNITURE MART, INC.**

v.

**CASTLE CREDIT CORPORATION, INC., et al.**

Civ. A. No. 76–1625.

United States District Court, E. D. Pennsylvania.

May 1, 1978.

Robert W. Maris, Philadelphia, Pa., for plaintiff.

James J. Boyle, Philadelphia, Pa., for defendants.

## OPINION

FOGEL, District Judge.

### I. PROCEDURAL AND FACTUAL HISTORY OF THE CASE:

Plaintiff, Major's Furniture Mart (Major's), was in the business of making retail sales of furniture to consumers, and defendant, Castle Credit Corporation (Castle), is in the business of financing furniture dealers. Major's and Castle entered into a Sale of Receivables Agreement (Agreement), dated June 18, 1973, by which Major's agreed to transfer its accounts to Castle, and Castle agreed to provide funds to Major's at a given ratio to the accounts it accepted. Castle accepted accounts offered by Major's from July, 1973 until June, 1975. In March, 1975, and again in September, 1975, Castle notified Major's that its failure to repurchase delinquent accounts constituted a default under the Agreement.

Major's, a New Jersey corporation, (both with respect to incorporation and situs of its principal place of business), then brought this diversity action pursuant to 28 U.S.C. § 1332(a) against Castle, (a Pennsylvania corporation as to incorporation and location of its principal place of business); it alleged damages in excess of $10,000 based upon the following four counts: 1) payment to it of sums held in the reserve account established by the agreement; 2) reimbursement of overpayments made to satisfy a $30,000 promissory note; 3) damages for the destruction of its business by misuse of confidential information; and 4) equitable relief and damages for violations of the anti-trust laws. Castle filed counterclaims with respect to the first two counts, and alleged the following: 1) failure by Major's to repurchase accounts as required by the acceleration clause in the agreement, and 2) default on the promissory note. Pursuant to our Order dated March 19, 1977,[1] Major's filed an amended complaint which revised its theory of recovery under Count I, and dropped Count IV. The parties then filed cross-motions for summary judgment with respect to Count I; Major's filed a motion for summary judgment with respect to the counterclaim to Count I; Castle moved for summary judgment as to Count II and its

---

1. Our Order stated that plaintiff could file an amended complaint on Count II, rather than Count I. Our notes of the pre-trial conference indicate that this was a clerical error, and that Count I was intended. Defendant suffered no harm from this confusion, as he had argued in his motion for summary judgment, filed April 19, 1977, that the theory of liability advanced in the pre-trial order, which is identical to the amended complaint, superseded the complaint.

counterclaim under that same count. On June 13, 1977, we granted Major's motion for summary judgment, with an opinion to follow, and denied all of Castle's motions. Trial was held on Counts II and III, and the jury decided in favor of Castle. On July 25, 1977, we ordered that the parties submit briefs, proposed findings of fact and conclusions of law, and reply briefs, and scheduled oral argument,[2] to resolve the accounting issue left open by our grant of summary judgment in part on Count I of the complaint. Our reasons for the grant of plaintiff's motions for summary judgment and determination of the accounting issue follow.

## II. SUMMARY JUDGMENT:

The question presented for decision on summary judgment was whether accounts receivable held by Majors were sold to Castle or transferred as collateral security. Apparently, under the facts of this case, the matter is one of first impression. The significance of this question goes to the issue of Major's right to any surplus collected by Castle on the accounts, over and above the amount paid or loaned to Major's in exchange for the accounts.

Article 9 of the Uniform Commercial Code, (U.C.C.), applies "to any sale of accounts, contract rights or chattel paper," with exceptions not applicable to this type of transaction. 12A P.S. § 9–102(1)(b). *Section 9–502(2) makes a distinction between transactions which "secure an indebtedness," and "sales," in the allocation of debtor's rights and creditor's obligations after a default.* That section reads as follows:

A secured party [Castle] who by agreement is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor [Major's] who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections. *If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus*, and unless otherwise agreed, the debtor is liable for any deficiency. But, *if the underlying transaction was a sale of accounts, contract rights or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.* (Emphasis added.) § 9–502(2).

*Thus, if Major's accounts receivable were transferred to Castle as collateral to secure an indebtedness, then Castle must first account for and then, under Section 9–504(2), turn over any surplus to Major's. If, however, the accounts were sold to Castle, then Major's is only entitled to the surplus if the security agreement so provides, which, in fact, it does not.* A debtor's right to a surplus under sections 9–502(2) and 9–504(2), in the case of a transfer for security, (as opposed to a sale), cannot be waived by Agreement. Section 9–501(3)(a).

Castle makes three arguments in support of its contentions that the transactions pursuant to the agreement were sales of accounts:

1) On its face, the contract unambiguously uses terms of "sale" and "purchase", and the meaning of such a clear statement of the parties' intent can only be determined from the four corners of the document;

2) the provisions in the Agreement for full recourse against Major's does not determine whether transactions were sales or transfers of collateral; and

3) the conduct of the parties, including the allegations in the original complaint, establish that the transactions were in fact sales.

We do not find these contentions to be persuasive.

### 1) Language of the Agreement:

The rule of contract interpretation cited by defendant has never been applied

**2.** Illness of defendant's counsel caused the oral argument to be postponed until December 20, 1977.

to this type of transaction. In a pre-U.C.C. case which analyzed the precise question, the issue was whether, in the words of the Pennsylvania Supreme Court,

> the transactions which included the assignment of the contracts to the finance company, the advancement of a percentage of the amounts due on them, the written guaranties of payment by Integrity, and the matters incidental to them, amounted to sales of the contracts for consideration or merely the advancement of loans to Integrity by the defendant, finance company, on the security of the assignments;

the court noted at the outset that

> [i]n cases of this kind it is more important what parties actually do than what they say they do. . . . Transactions similar in character to these have frequently been held in fact loans, though apt words importing sales were used by the parties.

*Kelter v. American Banker's Finance Co.*, 306 Pa. 483, 160 A. 127, 129, 130 (1932). Both the comments which follow Section 9–502 and the explicit policies incorporated in Section 9–501(3)(a) demonstrate that Pennsylvania Courts today would adopt the rationale of *Kelter*.[3]

Comment 2 to Section 9–502 reveals legislative intent to distinguish between two types of accounts receivable financing, which are functionally similar for most commercial purposes, when a default does occur. See G. Gilmore, *Security Interests In Personal Property*, §§ 8.1–8.8, 44.4. To the extent that the assignee "retains a right of full or limited recourse or charge-back for uncollectible accounts," both debtor and creditors have a right to insist the assignee act so as not "to increase a possible deficiency claim or to reduce a possible surplus;" to the extent the assignee assumes the credit risk fully, "neither the debtor nor his creditors have any legitimate concern with the disposition which the assignee makes of the accounts." § 9–502, Comm. 2.

*A traditional "factoring" arrangement in which the parties use the terms "transfer of security interest" would clearly be treated as a sale, if the entire credit risk had passed to the assignee. Contractual language which characterizes the original transaction as either a "sale" or "transfer" does not address the functional distinction that is crucial in the default situation:—whether the assignee retained a sufficient interest in the collection of the accounts to bring the non-waivable protections of § 9–502(2) into effect.* See § 9–502, Comm. 3.

Finally, we must examine the non-waiver provisions of section 9–501(3)(a). If "magic words" were determinative of the debtor's rights, the non-waiver policy could be circumvented by the mere use of the terms "sale" or "purchase" in an accounts receivable financing agreement; the financer could always avoid accountability for surpluses by the use of sales language. Thus, we must look to the substance of the transaction, and not be sidetracked by passing clauses, no matter how clear and artistically drawn.

### 2) Full Recourse Provision:

 We also reject Major's contention that a *per se* rule applies in this case because of the full recourse provision. Major's has argued that the existence of a provision for full recourse automatically transforms any sale of accounts into a transfer of a security interest for the purposes of Section 9–502(a). See *Gilmore, supra*, § 44.4 at 1230. This reading of the Code finds support in the above-cited portion of Comment 2, but ignores the decisive effect of Comment 4: "the subsection recognizes that there may be a *true sale of accounts . . . although recourse exists*. The determination whether a particular assignment constitutes a sale or a transfer for security is left to the courts." (Emphasis added.) Although we do not find

---

3. Of course, in a diversity case we sit as a court of Pennsylvania, and must apply Pennsylvania substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *We note that neither counsel, nor our own re-* *search, has revealed any case law in this jurisdiction, or in any other jurisdiction, which has ruled upon this provision of the U.C.C. in the context of this case.*

Major's interpretation of this comment, which relies on a distinction between recourse based on warranties of *quality* and recourse based on guarantees of *collectibility*, to be supported by the statute, comments or treatises, we read the comments to Section 9–502, in their entirety, to state that the allocation of credit risks is indicative, but not determinative, of the nature of the transaction.

In the instant case the allocation of risks heavily favors Major's claim to be considered as an assignor with an interest in the collectibility of its accounts. It appears that Castle required Major's to retain *all* conceivable risks of uncollectibility of these accounts. It required warranties that retail account debtors—e. g., Major's customers—meet the criteria set forth by Castle, that Major's perform the credit check to verify that these criteria were satisfied, and that Major's warrant that the accounts were fully enforceable legally and were "fully and timely collectible." It also imposed an obligation to indemnify Castle out of a reserve account for losses resulting from a customer's failure to pay, or for any breach of warranty, and an obligation to repurchase any account after the customer was in default for more than 60 days. Castle only assumed the risk that the assignor itself would be unable to fulfill its obligations. Guaranties of quality alone, or even guarantees of collectibility alone, might be consistent with a true sale, but Castle attempted to shift all risks to Major's, and incur none of the risks or obligations of ownership. It strains credulity to believe that this is the type of situation, referred to in Comment 4, in which "there may be a true sale of accounts . . . . although recourse exists." When we turn to the conduct of the parties to seek support for this contention, we find instead that Castle, in fact, treated these transactions as a transfer of a security interest.

*3) Conduct of the Parties:*

■ As Castle has noted, the course of performance of an agreement is a useful

indication of the parties' intent. *See* § 2–208. Of the actions cited by the parties, a letter from Irving Canter, President of Castle Credit, dated August 31, 1973, seems to be most telling. This letter, in effect, announces the imposition of a floating interest rate on loans under a line of credit of $80,000 per month, based upon the fluctuating prime interest rate. The key portion of the letter states:

> Accordingly, your volume for the month of September cannot exceed $80,000. Any business above that amount will have to be paid for in October. I think you'll agree that your quota is quite liberal. The surcharge for the month of September will be 3% of the principal amount financed which is based upon a 9½% prime rate. On October 1, and for each month thereafter, the surcharge will be adjusted, based upon the prime rate in effect at that time as it relates to a 6½% base rate. . . .

This unilateral change in the terms of the Agreement makes it obvious that Castle treated the transaction as a line of credit to Major's—i. e., a loan situation. Were this a true sale, as Castle now argues, it would not have been able to impose these new conditions by fiat. Such changes in a sales contract would have modified the price term of the agreement, which could only be done by a writing signed by all the parties. (Paragraph 16 of the Agreement.)

Castle does not cite an instance of any conduct by Major's that is inconsistent with the treatment of these transactions as a transfer of collateral. This is not surprising, given the functional similarity between a sale of accounts and a transfer of accounts as a security interest; indeed, prior to default, the characterization of the Agreement as one or the other would have little, if any, business significance.[4] Castle's argument, that Major's compliance with the terms of the Agreement demonstrates that it was intended to be a sale, is

---

4. For example, the requirement that Major's "repurchase" delinquent accounts is functionally equivalent to a requirement to preserve the value of the collateral; Major's payments on uncollectible accounts is thus consistent with both characterizations of the transactions.

simply not persuasive in these circumstances.

■ Castle's second contention, that Major's' counsel [5] characterized the transaction as a sale, also lacks merit. Counsel's letters, interrogatories, and/or the original complaint demonstrate no more than an erroneous legal judgment concerning the nature of the transaction. There is no magic in the use of the terms "sale" or "purchase;" counsel's use of these terms could have no greater effect than the language of the Agreement itself, nor can counsel's conduct be deemed a waiver in light of the non-waiver provisions of Section 9–501(3).

■ Accordingly, we held initially and now reiterate that the transactions between Castle and Major's pursuant to the Agreement "secured an indebtedness" within the meaning of Section 9–502(2); therefore, Castle must account to Major's for any surplus, as Major's must account to Castle for any deficiency.

### 4) Counterclaim to Count I

Castle's counterclaim seeks the face amounts of all the accounts as yet uncollected pursuant to Paragraph 13 of the Agreement, which requires acceleration of the full recourse clause upon default. Major's contends that this provision merely created a right which Castle could have sought to enforce in a judicial proceeding; it claims that Castle's exercise of its rights pursuant to § 9–502(1) and its commencement of collection triggered the provisions of § 9–502(2). Major's further contends that it no longer had an obligation to repurchase, once Castle accumulated a surplus and ceased to loan money.

■ Since we hold in Part III of this opinion that Castle has in fact accumulated a surplus, we need not decide the question of the election of remedies raised by Major's. It follows from our decision, with respect to Major's Count I claims that the

repayment of Major's loan obligations extinguished Castle's security interest in the accounts receivable. Thus, the next inquiry goes to the nature of those obligations.

### III. ACCOUNTING:

Our grant of summary judgment disposed only of the narrow issue that goes to the applicability of Section 9–502(2). We now determine, after full consideration of the briefs, reply briefs, oral presentations and supplemental letters of both parties, whether, in fact, a surplus or a deficiency did exist as of July 1, 1977, the date which we ordered to be used for this purpose.

■ Both parties agree that the accounting must proceed by a comparison of the amount collected by Castle with the amount due Castle pursuant to the Agreement. The parties further agree that the amount collected can only be calculated by subtracting the face value of the open accounts from the total value of the security interest transferred, since Castle did not keep direct records of the amount it actually collected. It is the determination of Major's' obligations to Castle that poses the difficult question.

Major's argues that 1) in our summary judgment decision we necessarily decided that the accounts receivable were collateral owned by Major's, to which Castle has no legal claim beyond its security interest, and 2) Castle's rights are limited to the repayment of the money it actually loaned to Major's, an 18% discount of the face amount of the accounts, (exclusive of insurance and interest charges), insurance charges and the actual expenses incurred in post-default collection.

Castle responds that the Agreement gave it a right to the entire amount of the accounts, whether considered as collateral or purchases. Thus, the finance charges incurred by the customers, repurchase charges to the reserve account, and the

---

**5.** We note that these efforts were made by plaintiff's previous counsel.

remaining uncollected amounts should all be credited to Castle.

### A. The Account Debtor Interest Charges and Uncollected Amounts:

Castle first argues that Major's has conceded its right to interest due from account debtors in its prior memorandum. Major's responds that it mistakenly confused the interest from the account debtors with the interest Castle earned by the deduction. It follows that the citation to *Kelter*, in this regard, was also mistaken; unlike that case, in which the financing party only charged interest to the account debtor, Castle charged an 18% deduction to the assignor as a fee for use of the money. We do not believe that counsel's misunderstanding, corrected prior to our decision on his motion for summary judgment, should affect a determination of the accounting issue. In contrast to the *Kelter* transaction, Castle also claims an entitlement to *both* an interest charge to account debtors *and* an interest charge to the assignor for the same loan transaction.[6] Castle advances the following arguments in support of its claims: 1) it, not Major's, advanced the money to finance the purchase of furniture; 2) therefore, it, not Major's, is the sole creditor in the transaction; and 3) the additional deduction charged to Major's was a reasonable business response to the high credit risks and collection costs posed by Major's low-income customers and weak financial condition.

██ In light of our previous conclusion that these accounts were transferred as a security interest, it seems more credible to view the series of transactions as follows:

1) Major's sold furniture to a customer in exchange for a security interest in the furniture and a note to pay the purchase price, insurance costs and interest charges on monthly installments over a two year period;

2) Castle then loaned money to Major's in exchange for a security interest in Major's chattel paper;[7] and an 18% interest charge on the loan (the deduction);

3) Major's, in effect, then loaned this money to its next customer in exchange for the above-mentioned note and a security interest in the furniture, thus creating new chattel paper, which it then transferred to Castle;

4) Castle protected this collateral by terms in the Agreement which required Major's to restore its value under various conditions: defective warranty of collectibility, default on payments by account debtors, or repossession of the furniture by Major's. Castle specifically protected its security interests from the alleged high risks by the creation of an interest free reserve fund and a buy-back provision. The record gives no indication of any collection costs to Castle during the life of the agreement that would provide a reasonable business basis for an 18% deduction.[8]

██ We agree that Castle has an interest in the accounts receivable, but only as the holder of collateral securing its loan to Major's. Its efforts to assure the collectibility of these accounts are consistent with its financial stake in maintaining the value of its security interest. Castle asks us to view these transactions as two entirely dis-

---

6. E. g., in acct. # 15915, Castle advanced $1,224 to Major's, charged $308 to Major's, and now claims an entitlement to the $588 charged to the account debtor for use of that money for a two year period.

7. Although neither party uses the term, these "accounts" appear to be chattel paper within the meaning of U.C.C. § 9–105(1)(b).

8. Castle made a motion to present testimony on the reasonableness of the agreement as it has characterized it. The Court denied that motion at oral argument on December 20, 1977, on the ground that it addressed factual ques-

tions which had already been decided on the motion for summary judgment. Counsel for Castle had the opportunity to present affidavits in support of its cross-motions for summary judgment on count I with respect to these factual questions. Factual affidavits concerning the administrative costs of collections could also have been submitted along with the briefs on the accounting issue. Having failed to bring these matters before the Court, Castle will not now be permitted to argue on the basis of alleged facts not contained in the record.

tinct matters—a loan to Major's secured by the face value of the note exclusive of interest, and a loan to the account debtor, secured by Major's security interest in the furniture; we find no basis in the Agreement or the record to do so. *Indeed in the absence of such a clear provision to this effect, we will not interpret an agreement in a manner which would give Castle's its sorely coveted windfall of two payments when one makes it whole.*

■ Castle also argues that we should enforce the assignment, full recourse and acceleration clauses of the Agreement as standards for the evaluation of surplus and deficiency permitted by § 9–501(3)(a). We disagree. Section 9–501(3) permits the parties to set standards for the "fulfillment of these [non-waivable] rights and duties . . insofar as they require accounting for surplus proceeds of collateral" pursuant to Section 9–502(2). Section 9–502(2) only applies when a secured party attempts to make collections on the collateral after default, (or by agreement). The Agreement makes no reference to this situation, aside from the general assignment of rights clause; certainly, there is no provision which addresses the standards for accounting in the event that Castle undertook collections on the collateral.

■ *Paragraph 5,* which entitles Castle "to all of the rights possessed by MAJOR in each such Account," merely makes explicit an incident of a true sale of accounts, and thus, in light of our decision that these transactions were a transfer of collateral, has no independent effect in an accounting pursuant to Section 9–502(2).

*Paragraph 10* requires a "repurchase" after default of the entire deficiency, (less a rebate of interest under the "Rule of the 78's"); as noted above, we view this as consistent with an obligation to maintain the value of the collateral, so that the use of the sales language again has no independent significance at this point in the proceedings.

■ *Paragraph 12* regulates computation of a surplus during the life of the Agreement, but does not, by its own terms, apply to the default situation regulated by section 9–501 and 9–502(2). Castle also seems to argue that paragraph 12 limits the surplus to the reserve created by the Agreement. This is contrary to Comment 3 to Section 9–502(3), which states that the accounting will be limited to the reserve only when an agreement limits *both* parties' risk to the amount in that reserve. The full recourse provisions undercut any such claim.

■ *Paragraph 13,* the acceleration clause, is manifestly *not* a "standard" fulfillment for the "accounting for surplus proceeds of collateral" within the meaning of § 9–501; it does not even mention the collection rights of the secured party, and its obligations, pursuant to § 9–502.

■ We conclude that the Agreement only affected the retail accounts between Major's and its customers to the extent it created a security interest in Castle with respect to the chattel paper transferred to Castle. · Whatever rights and obligations existed during the operation of that Agreement with respect to the creation, maintenance or replacement of collateral and the making and repayment of loans were superseded by the non-waivable provisions of Section 9–502, once Castle placed Major's in default and began to collect the accounts itself. *We therefore hold that, since Castle had only a security interest in the interest payments made by the account debtors, it must now account to Major's for any surplus attributable to this portion of the accounts it accepted.*

**B. The Reserve:**

■ Pursuant to the Agreement, Major's "repurchased" numerous defaulted accounts by making a cash payment for 50% of the amount due, and having the remainder, a sum of $22,972.28, deducted from the reserve account. Major's counsel has not contested this obligation, but instead has

sought to set off various entries totaling $20,919.27, credited to the reserve by Castle. The parties agree that three of the entries (items 9, 11 and 12 in Part V of this Opinion), though properly credited to Major's, arose from different transactions than those contested in Count I, and should not affect this accounting. The remaining entry, $5,899.44, represents accounts that Castle did not accept as collateral, but rather agreed to attempt to collect solely as Major's' agent. Therefore, this amount must also be excluded from the accounting, despite the untimely manner in which counsel presented this information to the Court. In conclusion, we determine that Castle must be credited with the full $22,972.28 charged to the reserve during the operation of the Agreement.

## IV. THE COUNTERCLAIM TO COUNT II:

At trial Castle prevailed on its Counterclaim to Count II. The accounting effect of the verdict has been left to the Court to decide. Major's does not dispute Castle's entitlement to a judgment for $14,445 (the face amount of the unpaid portion of the loan minus Castle's collections on collateral). It does contest an award of interest and attorney's fees pursuant to the loan agreement on the grounds that the loan obligation should have been set off immediately against Major's accumulated surplus in a related transaction. At the time Major's stopped payment on the note

in March, 1976, Castle had in its possession a substantial surplus generated by collections on the accounts receivable financing agreement of June 18, 1973. The surplus held by Castle and the deficiency on the loan owed by Major's are cross-obligations which arose out of cross-transactions between the parties. As such, the cross-obligations must be set off against each other. *Willing v. Lupin Building and Loan Ass'n*, 20 F.Supp. 774, 777 (E.D.Pa.1937). We so hold.

## V. JUDGMENT: [9]

**I. Collateral Held by Castle:**

| | | |
|---|---|---|
| Item 1. | Total Accounts Receivable | 596,901.88 |
| Item 2. | Uncollected Accounts Rec. | 70,310.44 |
| Line A: | Net Value of Collateral | 526,591.44 |

**II. Major's Obligations to Castle**

| | | |
|---|---|---|
| Item 3. | Payments by Castle | 316,107.42 |
| Item 4. | Deductions | 77,957.35 |
| Item 5. | Charges to Reserve | 22,972.28 |
| Item 6. | Insurance | 42,304.03 |
| Item 7. | Collection Costs | 1,627.81 |
| Line B: | Total Obligations | 460,968.89 |

| | | |
|---|---|---|
| III. | Accounting of Surplus | 65,622.55 |

**IV. Counterclaim**

| | | |
|---|---|---|
| Item 8. | Loan and Costs | 15,000.00 |
| Item 9. | "Flipped" accounts | 4,386.93 |
| Item 10. | Collections | 555.00 |
| Line C: | Net | 10,058.07 |

**V. Miscellaneous Obligations to Major's**

| | | |
|---|---|---|
| Item 11. | Loan | 10,000.00 |
| Item 12. | Insurance Overcharge | 632.90 |
| Line D: | Total | 10,632.90 |

| | |
|---|---|
| Total owing to Major's (Line A & Line D) | 537,224.34 |
| Total owing to Castle (Line B & Line C) | 471,026.96 |
| | $ 66,197.38 |

Amount of Judgment $66,197.38

**9.** Source of each item set forth below:

1. Castle's adjustments to the amounts cited by Major's in items 1 and 3 are roughly equivalent to the adjustments made by Major's in Item 1 (see trans. 12/20/77 at 24–27); Major's acknowledges that Castle has provided all the accounting numbers, so we deem it reasonable to apply these figures when it would not be unjust to Major's to do so.

2. Castle claims this amount should be $77,686.34. Counsel for Major's put forward a reasonable explanation of the lower amount in oral argument (Trans. 12/20/77 at 28–29). We gave Castle until the first week in January to respond to these contentions; no response was forthcoming. (Trans. 12/20/77, 30; letter by

Major's 1/19/78). We therefore accept Major's uncontested explanation of this amount. As previously noted, both parties agree Castle did not keep records of the amount actually collected.

3. See item 1 comments.
4. Uncontested.
5. See discussion in Part III B.
6. Uncontested.
7. Uncontested.
8. See discussion in Part IV.
9. Uncontested. (Letter, 4/28/78)
10. Uncontested.
11. Uncontested. (Letter, 4/28/78)
12. Uncontested. (Letter, 4/28/78)