In re NIXON MACHINERY
COMPANY, Debtor.

CREDIT ALLIANCE CORPORATION,
Plaintiff,

v.

NIXON MACHINERY COMPANY,
Defendant.

Bankruptcy No. 1–80–00779.
Adversary Proceeding No. 1–80–0170.

United States Bankruptcy Court,
E. D. Tennessee.

Oct. 31, 1980.

David A. Dycus, Chattanooga, Tenn., Atty. for the plaintiff.

Kyle R. Weems, Chattanooga, Tenn., Atty. for the defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

This proceeding concerns five machines sold by Nixon Machinery to various buyers. The buyers executed promissory notes to Nixon Machinery, and it retained security interests in the machines. Credit Alliance financed the sales. Nixon Machinery assigned its rights to Credit Alliance in return for payment but agreed to re–purchase the note of any defaulting buyer. All the buyers defaulted and Nixon Machinery repossessed the machines. Nixon Machinery filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. 11 U.S.C. (1979). At the time it had possession of four of the machines. The other had been leased. Credit Alliance brought this action to recover the machines and the lease payments. The court finds the facts as follows.

All of the transactions took place in essentially the same order.

Nixon sold a machine to a buyer. A single document was used that included a promissory note, security agreement, and assignment. The buyer executed the promissory note to Nixon for the balance of the price and interest and granted Nixon a security interest. Credit Alliance financed the sale. In return for payment by Credit Alliance, Nixon assigned to it the note and security agreement. Nixon also executed separate assignments except in one case, where a Credit Alliance form, a "Conditional Sale Contract Note", was used.

The assignment on the back of the combination note and security agreement provides in part:

For value received, the Undersigned Payee of the within Promissory Note and Secured Party in this Security Agreement hereby transfers, and assigns all its rights in said Promissory Note and Security Agreement to Credit Alliance Corporation ... The undersigned agrees ... if assigned with full recourse [and] default occurs by the maker ... it will repurchase this Promissory Note on demand.

The two signature blocks were headed "Without Recourse Except For Above Warranties" and "With Full Recourse." The assignments were signed in the full recourse block.

The separate assignments provide that Nixon sells, assigns, and transfers its rights in the note and security agreement to Credit Alliance. As to Nixon's liability on default of the buyer, they provide:

We represent warrant and agree as to said contract: ... there is still unpaid and owing thereon the sum total of the unmatured instalments stipulated in and evidenced by said contract, the payment of which will be made by us if not paid by the Obligor, together with interest, attorney's fees, court costs and other expenses in connection therewith ....

The assignment in the Conditional Sale Contract Note provides:

[Seller] ... warrants the payment when due of each sum payable thereunder and the payment on demand of the entire unpaid balance, in the event of nonpayment by the Buyer ... of any payment at its due date, or of any other default by Buyer without first requiring Assignee to proceed against Buyer. Seller will reimburse Assignee for all expenses not paid by Buyer in connection with enforcing its rights ... including ... attorneys' fees, court costs, expenses of repossession and sale and interest on overdue payments ....

In all of the assignments Nixon warranted that it had good title to the machine sold.

The assignment in the conditional sale contract contains a provision not in the other assignments.

Seller shall have no authority without Assignee's prior written consent to accept collection and/or repossess and/or consent to the return of the property and/or modify the terms of the contract.

The security agreements and the conditional sale contract did not provide that Nixon was granted a security interest. Rather, they provided that Nixon or its assignee retained title or ownership until payment in full.

Subsequently the buyers defaulted in payments.

In each case Nixon repossessed the machine or machines. Around the time of repossession Nixon executed as to each machine a "trust letter" which provides:

This is to confirm that we now hold ... for your account and subject to your exclusive written instructions and control, the equipment described in the above—captioned Agreement ... which Agreement we have heretofore sold and assigned to you, and shall not remove nor permit same to be removed ... without your written instructions ... We acknowledge that title to the Equipment is and shall remain vested solely in you and that our holding of the equipment for your account does not and shall not release nor impair our obligations to you

... and is without prejudice to your rights and remedies against us, any other person and the Equipment. We hereby waive, postpone, subordinate and assign to you ... all other rights, statutory or otherwise, which we may have with regard to the Equipment and any additions and improvements thereto .... Any note delivered to you in conjunction with this letter is not and shall not be deemed payment of our obligation to repurchase captioned Agreement, but only evidences such obligation.

.     .     .     .     .

At the same time Nixon executed a promissory note to Credit Alliance for the balance due from the buyer plus finance charges and less some deferred service charges. The note provided for Nixon to pay the interest for several months and then for the entire amount, principal and remaining interest, to be due. In each case another note, with essentially the same provisions, was executed about the time the first or previous note became due. Such notes were executed until in each case a final one was executed on March 14, 1980 and had not reached maturity when Nixon filed its Chapter 11 petition on April 25, 1980. Nixon made payments on some of the notes.

At the same time Nixon executed financing statements which Credit Alliance thereafter filed with the Secretary of State. The financing statements describe the collateral as—

All goods, inventory and equipment described in security agreement(s), trust letter(s) and/or schedule(s) annexed thereto between debtor and secured party.

They also provide:

This filing is made for notification purposes only, as debtor is the bailee of goods, inventory and equipment for the secured party and title to and ownership of the goods, inventory and equipment is and shall remain vested in the secured party.

The trust letters were attached to the financing statements.

As to four of the machines, Nixon began "foreclosure" after it executed the trust letters and notes to Credit Alliance. Nixon gave notice to the debtors. It also posted a public notice of sale and advertised the sale in the newspapers. The public notice and the newspaper advertisements recited that Nixon would sell the machines at public auction. In each case Nixon purchased the machine at the auction by bidding less than it owed Credit Alliance.

As to the fifth machine, Nixon carried out the same procedure before it executed the note to Credit Alliance and the trust letter covering that machine.

William G. Bagby testified for Credit Alliance. He testified that Credit Alliance would credit against Nixon's debt the proceeds of the sale of a machine to which it had agreed. He also testified that if a sale produced more than Nixon owed, then Nixon could keep the difference. He said that Nixon would have to ask for Credit Alliance's permission to sell even if the price exceeded the debt. He clarified that by saying that Nixon would have to ask to pay, but that Credit Alliance would not refuse payment in full. He also testified that Nixon had repossessed numerous machines for Credit Alliance over the last couple of years. All the others have been disposed of, and these five are what remained at the time of bankruptcy.

At the time of the trial one of the machines was leased. The lease payments were $6,000 per month. They were not being paid to Credit Alliance. Mr. Nixon was certain that this machine is worth more than the amount owed against it.

One of the machines, a Yale 7500 loader, required extensive repairs after it was sold. Nixon wants to keep it as evidence for a lawsuit that it may file. Mr. Nixon testified that Nixon has five such machines, all of which required repairs, but this machine required the most. He also testified that with repairs this machine would be usable. Nixon repossessed this machine in October, 1978.

As to the other three machines Mr. Nixon testified that he believes when the market improves the two trucks will be worth more than is owed against them. He also testified that Nixon presently has a quote for leasing the trucks. As to the dozer he did not think it is worth more than is owed, though in the spring it might be. These three machines were repossessed in December, 1979.

Both Mr. Nixon and Mr. Bagby testified that the market for such machinery has been bad for several years. Mr. Nixon expected an improvement in the market this fall. He based that expectation on the fact that very few machines have been bought in the last few years, and replacements must be bought. He testified that such machines have a useful life of three to five years. He also expected that the market will improve even more in the spring because the United Mine Workers' union contract expires in March, and a new contract will have to be negotiated. Mr. Bagby would make no prediction as to when the market might improve.

Mr. Nixon also testified that revenue from these machines is necessary for Nixon's successful rehabilitation in Chapter 11.

## DISCUSSION

The question in this proceeding is whether the defendant, Nixon Machinery, is entitled to keep the machines in order to successfully carry out its Chapter 11 reorganization. The question has two parts—(1) whether Nixon has an interest in the machines and (2) if it does, whether it should be allowed to continue in possession of the machines.

■ A Chapter 11 debtor is entitled to keep and use its property subject to certain limitations. 11 U.S.C. §§ 361, 362, 363 (1979). The debtor's property generally is anything in which it has an interest. 11 U.S.C. § 541 (1979). The plaintiff contends that Nixon Machinery has no interest in these machines other than as a bailee, and so should turn them over to it.

As to the first part of the question, the governing law primarily is the Uniform Commercial Code (UCC), particularly Arti-

cle 2 on sales and Article 9 on secured transactions. The UCC in Tennessee is codified in Title 47 of the Tennessee Code Annotated, §§ 47–1–101–9–507 (Repl. Vol. 1979). Hereafter the court will cite sections of the UCC without the code title number.

■ In the court's opinion, the facts raise only one substantial issue as to Nixon's interest in the machines. It appears clear to the court that Nixon has an interest in the machines at least up to the amount it owes Credit Alliance. The question is whether Nixon has an interest in any surplus value, "equity", in the machines. The parties' arguments were enlightening, but the court will begin with more elementary matters.

When Nixon sold the machines, the buyers became the owners. UCC § 2–401(2). By retaining title Nixon did not retain ownership. Retention of title gave Nixon security interests in the machines, nothing more. UCC §§ 1–201(37) & 2–401(1). Credit Alliance acquired Nixon's security interests in the machines through Nixon's sales or assignments of its notes and security agreements.

Nixon's sales or assignments were transactions also governed by Article 9 of the UCC. The notes and security agreements were "chattel paper" as defined in § 9–105(1)(b). Article 9 applies to any sale of chattel paper. UCC § 9–102(1)(b). There has been some debate about whether Article 9 was really intended to apply to all sales of chattel paper or only to security transactions. See 1 G. Gilmore, Security Interests in Personal Property § 10.5 at 309 (1965); UCC § 9–102, Comment 1; § 9–104, Comment 6; § 9–504, Comment 3.

The distinction is not relevant here. The sales were for security. That would be clearer except that Credit Alliance did not look first to Nixon for payment. If the buyers had paid, Nixon would not have owed Credit Alliance anything. That distinction overlooks the fact that payment from the buyers was the same as payment from Nixon. Nixon paid Credit Alliance by transferring its right to payment from the buyers. Under the recourse agreements, Nixon was obligated to pay what the buyers didn't pay and Credit Alliance didn't recover by foreclosure. There was no proof of how much Credit Alliance paid Nixon. The court may assume as to each note that it was less than the total of payments due under the note. Otherwise, Credit Alliance could make no profit from its financing. Nixon's recourse obligation was to repay not what it received but what remained due under the note. Nixon received money that it was obligated to repay with interest by assignment of the buyers' notes, payment under the recourse agreements, and transfer of its security interests.

Thus there were two related secured transactions. First Nixon was the secured party, the buyers were the debtors, and the machines were the collateral. In the second transaction, Credit Alliance was the secured party or transferee, Nixon was the debtor or transferor, the chattel paper was the collateral, and the buyers were the "account debtors". UCC § 9–105(1)(a).

Though Article 9 does not say so clearly, Nixon in effect had a beneficial interest in the machines as a result of the assignments. Technically, the chattel paper secured Nixon's debt to Credit Alliance. But Credit Alliance's realization from the machines would reduce Nixon's liability under the recourse agreements. Credit Alliance admitted as much—that Nixon is entitled to credit against its debt for what Credit Alliance realizes from the machines.

The trust letters and financing statements are ineffective to make the assignments "true sales" of chattel paper, rather than security transactions. See UCC § 1–201(37); § 9–102(2); § 9–203, Comment 4. If the assignments were true sales, Nixon would not be concerned with what Credit Alliance realized from the machines. See UCC § 9–502(2) & Comment 4; § 9–504(2) & Comment 3; *Major's Furniture Mart v. Castle Credit Corp.*, 602 F.2d 538, 26 UCC Rep.Serv. 1319 (3d Cir. 1979) *on appeal from* 449 F.Supp. 538, 23 UCC Rep.Serv. 1358 (E.D.Pa.1978); 2 G. Gilmore, Security Interests in Personal Property § 44.4 at 1230 (1965).

Of course, Nixon's interest in the chattel paper did not give it an interest in the machines above the amount of its debt to Credit Alliance. The buyers were still the owners of the machines.

After the buyers defaulted, Nixon repossessed the machines. It then executed the trust letters and financing statements and the notes to Credit Alliance. Nixon also carried out foreclosures by sale and bought the machines at the sales. Whether Nixon has an equity interest in the machines depends on the legal effects of these transactions.

Credit Alliance argued that Nixon has no interest in the machines except as a bailee for it. The main part of Credit Alliance's argument was that it owns the machines. Nixon argued that it acquired the buyers' interests and that Credit Alliance has only a security interest in the machines.

Certain points are clear.

*The Effect of Default and Repossession.* Neither Credit Alliance nor Nixon could have cut off and acquired the buyers' rights except through foreclosures. UCC § 9–504(3) & (4), § 9–505; *In re Trans National Communications, Inc.,* 11 UCC Rep.Serv. 238 (Bankr.Ct.S.D.N.Y.1972); *Brandywine Lanes, Inc. v. Pittsburgh National Bank,* 437 Pa. 499, 264 A.2d 377, 7 UCC Rep.Serv. 120 (1970), *subseq. case,* 220 Pa.Super. 363, 284 A.2d 802, 9 UCC Rep.Serv. 1285 (1971). The buyers' defaults and Nixon's repossessions were not enough to cut off the buyers' rights and transfer them to either Credit Alliance or Nixon.

Also, when Nixon repossessed, Credit Alliance acquired against it another security interest in the machines. This security interest arose as a result of the assignments of the chattel paper. UCC § 9–306(5)(b). Of course, in some cases the assignee of chattel paper may have more than a security interest in the goods. See UCC § 9–306, Comment 4. But that is not the situation in this case. The assignments were for security and not true sales of chattel paper. For protection against buyers from or creditors of Nixon, this security interest had to be perfected by filing a financing state-ment. UCC § 9–306(5)(d); *In re Haugabrook Auto Company, Inc.,* 9 UCC Rep.Serv. 954 (Bankr.Ct.M.D.Ga.1971).

After default and repossession, Credit Alliance had two security interests in each machine, one acquired by assignment and the other acquired as a result of the assignment. Credit Alliance did not own the machine; the buyer did. Nixon had an interest up to the amount of its debt to Credit Alliance. The buyer was entitled to any equity.

*The Effect of the Trust Letters, Financing Statements, and Notes.* Nixon apparently made two arguments as to the effect of the trust letters, financing statements, and notes. The first argument is that it reacquired its rights as secured party, foreclosed, bought in at the sales, and thereby acquired the buyers' rights. The second argument is more complex. It is a "novation" argument–that Nixon acquired the buyers' rights and they were released. The court will consider the second argument first.

There is one problem with the second argument. A novation to Nixon of the buyer's rights and obligations would be no more than a foreclosure in which Nixon acquired the buyer's rights. There was no proof that Credit Alliance followed the proper procedures for transferring the buyers' rights to Nixon by means of private sales. UCC § 9–504(3).

■ Of course, a buyer may cut off the debtor's rights despite defects in the foreclosure. By release of the buyers, Nixon would have assumed sole responsibility for any deficiencies. That could be considered the giving of value. But Nixon knew of the buyers' interests. In light of its business, Nixon must also have known that Credit Alliance was not disposing of the buyers' interests in accordance with Article 9's procedures. Nixon could not have cut off and acquired the buyers' rights as a result of the trust letters, notes, and financing statements. UCC §§ 9–504(4), 1–201(44), 1–201(19).

At best these transactions were not as to the buyers "dispositions" of the collateral that would cut off their rights. UCC § 9–504(5). The second argument must be rejected.

The first argument is similar to the second. The argument depends first on the proposition that Nixon reacquired its rights as secured party. Credit Alliance intended that Nixon not reacquire its rights as secured party. The trust letters make it clear that the notes were not considered payment under the recourse agreements. The court thinks that Credit Alliance could take the notes from Nixon without its being entitled to return of or subrogation to its former rights as secured party. Nixon already owed the obligations evidenced by the notes. After default, an assignee of chattel paper should be able to preserve its rights against the account debtor (buyer) while collecting from the assignor (seller). Of course, the seller's payments may give it rights against the buyers and in the goods. The court cannot say that Nixon reacquired its rights as secured party merely by giving the notes. The first argument must fail.

See generally *Reeves v. Associates Financial Services Co., Inc.*, 197 Neb. 107, 247 N.W.2d 434, 20 UCC Rep.Serv. 1110 (1976).

As to Credit Alliance's rights, the court does not see how they were in any way increased by the provision of the trust letters that it had title to the machines. It had the reserved titles that Nixon assigned to it. Semantically it had title. Legally it had security interests. Furthermore, the trust letters did nothing to cut off and transfer to Credit Alliance either the buyers' or Nixon's interests in the machines. The financing statements may have served to perfect Credit Alliance's security interest under § 9–306. Nixon has not challenged them.

*The Effects of Nixon's Foreclosures and Purchases.* If Nixon had reacquired its rights as secured party, the court might find that it foreclosed on its security interests, bid in its debts, and thereby acquired the buyers' interests in the machines. Since Nixon did not, what was the effect of its foreclosures and purchases at its sales?

■ The court must hold first that Nixon foreclosed with Credit Alliance's tacit approval though apparently not pursuant to specific directions. Nixon was not told of the buyers' defaults for no reason. Nixon had repossessed numerous machines for Credit Alliance. Credit Alliance must have expected Nixon to take appropriate action to protect their rights. See *In re Haugabrook Auto Company, Inc.*, above; *Osborn v. First National Bank of Holdenville*, 472 P.2d 440, 7 UCC Rep.Serv. 908 (Okl.1970). Repossession would be the first step. The court thinks that timely foreclosures would be another step.

It is not clear, but if Credit Alliance wanted to preserve its rights against the buyers, proper foreclosures should have been undertaken. The trust letters did not specifically deny Nixon the authority to foreclose. They did deny it authority to remove the machines without Credit Alliance's approval. The conditional sale contract did deny Nixon the right to dispose of the collateral. Nevertheless, Credit Alliance's witness testified that it would allow Nixon to go ahead with any sale to which it agreed. The court thinks that Nixon had the authority to carry out the foreclosures. They were effective to cut off the buyers' rights.

■ That leaves the question of whether Nixon acquired the buyers' rights. Credit Alliance might have argued that since Nixon was not a secured party, it must have bid in Credit Alliance's debts from the buyers. Nixon would have acquired the buyers' rights on Credit Alliance's behalf. There was no proof either way. The buyers were potentially liable to Nixon. Nixon had good reasons for buying the machines for its own benefit. The court concludes that Nixon bought the machines for itself and acquired the buyers' rights. UCC § 9–504(3) & (4).

Credit Alliance thereby lost one security interest. UCC § 9–504(4). It still has its second security interest good against Nixon. That is the situation now.

■ That brings the court to the question of whether Nixon should be allowed to keep the machines. There are several factors that might be relevant, but in this case only two are significant. Generally the court must weigh the possible benefit to Nixon against the detriment to Credit Alliance if Nixon is allowed to keep the machines.

Mr. Nixon testified generally to the importance of the machines to Nixon's rehabilitation under Chapter 11. Their importance depends mostly on whether they will produce income for Nixon—as equity from sales, as lease payments, or from recovery in a potential lawsuit.

The court will first consider the three machines last repossessed. None of them is leased nor the subject of a potential lawsuit.

Nixon has had these three machines since December, 1979. In that time it has not sold or leased any of them. Time may not be of the essence to the debtor but usually it is to the secured creditor. The secured creditor is deprived of its rights each day the debtor is allowed to keep the collateral without paying. It was not shown, however, that these machines are depreciating to Credit Alliance's detriment or are uninsured. Except for bankruptcy, Credit Alliance probably would not have disturbed Nixon's possession unless it found buyers or lessees. Nixon's claimed equity in the machines is speculative. It depends on an improvement in the market within the next few months. Nixon may be able to lease the two trucks soon but it has no immediate offers to purchase them or the dozer.

The court believes that Nixon should be given a chance to realize some income from the machines. But in light of its long possession already, that time should be limited. Furthermore, Nixon's right to lease the machines should not be without some consideration of Credit Alliance's rights. Of course, while Nixon is in possession, Credit Alliance may direct prospective purchasers or lessees to Nixon.

Accordingly, as to these three machines the court will allow Nixon a period of time within which it may attempt to sell or lease them. If Nixon finds purchasers at prices that will pay Credit Alliance and produce income for it, it may sell the machines on terms suitable to Credit Alliance. If Nixon finds purchasers only for lesser amounts, it may sell the machines with Credit Alliance's agreement. Likewise, Nixon may lease the machines at fair rentals but must account for the proceeds to Credit Alliance. On motion Credit Alliance may request the court to rule on whether or how the rental payments should be apportioned between it and Nixon.

The testimony was that the possibility of sales should increase greatly in the spring. Accordingly, the court will allow Nixon 150 days from the date of this order. If at the end of that time Nixon still has possession, then Credit Alliance can take the machines.

As to the machine which is the subject of a lawsuit, the testimony was that Nixon has no equity in it, but with repairs, it would be usable and saleable. The basis of the lawsuit was said to be the numerous repairs that this machine required. The court does not see why Nixon must have the machine itself for evidence. Its time of possession should not be extended for that reason without better proof that the machine is necessary.

Nevertheless, it appears that it might be to Nixon's benefit if it is allowed an opportunity to sell the machine. Nixon should be in a better position than Credit Alliance to put the machine in saleable condition, thereby increasing the proceeds of any sale and decreasing Nixon's liability to Credit Alliance. Nixon will be allowed 150 days after which Credit Alliance may retake the machine.

Finally, the fifth machine is now leased and producing income for Nixon. Nixon leased the machine without Credit Alliance's knowledge or approval. The court decided that Credit Alliance has a security interest in the machines, and Nixon is the debtor. That does not mean that Nixon could do with the machines as it pleased. The trust letters should not be completely ignored. See UCC § 9–205 & Comment 5.

Nixon argued that its agreement with other creditors is that it may keep 20% of the rental payments as compensation for services under the lease. That may in other cases be just. Nixon did not reach agreement with Credit Alliance before or after the leasing. Furthermore, Nixon has four other machines that Credit Alliance seeks to recover. Credit Alliance will be allowed to recover the others only after another delay and if Nixon cannot successfully dispose of them. Credit Alliance should be protected from further loss because of Nixon's continued possession. 11 U.S.C. § 361 (1979). Accordingly, the court thinks that Nixon should pay over to Credit Alliance part of the rentals that it receives and has received from this machine. Nixon, however, is entitled to some part for services rendered. A hearing will be set to determine a proper division of the rentals.

This memorandum constitutes findings of fact and conclusions of law. Rule 752, Bankruptcy Rules.