602 F.2d 538
 26 UCC Rep.Serv. 1319
 MAJOR'S FURNITURE MART, INC.
v.
CASTLE CREDIT CORPORATION, INC., Canter Consumer Discount
Company, andRobert's Furniture Company, Inc.,
Appeal of CASTLE CREDIT CORPORATION, INC.
 No. 78-1912.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6) Jan. 11, 1979.
Decided June 20, 1979.
 
 Arthur Silverman, Michael M. Westerman, Ettinger, Silverman, Balka, Basch & Levy, Philadelphia, Pa., for appellant.
 Robert W. Maris, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., for appellee.
 Before HUNTER, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge:
 
 
 1
 This appeal requires us to answer the question: "When is a sale not a sale, but rather a secured loan?" The district court held that despite the form of their Agreement, which purported to be, and hence was characterized as, a sale of accounts receivable, the parties' transactions did not constitute sales. Major's Furniture Mart, Inc. v. Castle Credit Corp., 449 F.Supp. 538 (E.D.Pa.1978). No facts are in dispute,[1] and the issue presented on this appeal is purely a legal issue involving the interpretation of relevant sections of the Uniform Commercial Code as enacted in Pennsylvania, 12A P.S. § 1-101 Et seq. and their proper application to the undisputed facts presented here.
 
 
 2
 The district court granted plaintiff Major's motion for summary judgment. Castle Credit Corporation appeals from that order.[2] We affirm.
 
 
 3
 * Major's is engaged in the retail sale of furniture. Castle is in the business of financing furniture dealers such as Major's. Count I of Major's amended complaint alleged that Major's and Castle had entered into an Agreement dated June 18, 1973 for the financing of Major's accounts receivable; that a large number of transactions pursuant to the Agreement took place between June 1973 and May 1975; that in March and October 1975 Castle declared Major's in default under the Agreement; and that from and after June 1973 Castle was in possession of monies which constituted a surplus over the accounts receivable transferred under the Agreement. Among other relief sought, Major's asked for an accounting of the surplus and all sums received by Castle since June 1, 1976 which had been collected from the Major's accounts receivable transferred under the Agreement. (App. 64-65).
 
 
 4
 The provisions of the June 18, 1973 Agreement which are relevant to our discussion provide: that Major's shall from time to time "sell" accounts receivable to Castle (P 1), and that all accounts so "sold" shall be with full recourse against Major's (P 2). Major's was required to warrant that each account receivable was based upon a written order or contract fully performed by Major's.[3] Castle in its sole discretion could refuse to "purchase" any account (P 7). The amount paid by Castle to Major's on any particular account was the unpaid face amount of the account exclusive of interest[4] less a fifteen percent "discount"[5] and less another ten percent of the unpaid face amount as a reserve against bad debts (P 8).[6]
 
 
 5
 Under the Agreement the reserve was to be held by Castle without interest and was to indemnify Castle against a customer's failure to pay the full amount of the account (which included interest and insurance premiums), as well as any other charges or losses sustained by Castle for any reason (P 9).
 
 
 6
 In addition, Major's was required to "repurchase" any account "sold" to Castle which was in default for more than 60 days. In such case Major's was obligated to pay to Castle
 
 
 7
 an amount equal to the balance due by the customer on said Account plus any other expenses incurred by CASTLE as a result of such default or breach of warranty, less a rebate of interest on the account under the "Rule of the 78's". . . .[7]
 
 
 8
 App. at 22, P 10. Thus essentially, Major's was obligated to repurchase a defaulted account not for the discounted amount paid to it by Castle, but for a "repurchase" price based on the balance due by the customer, plus any costs incurred by Castle upon default.
 
 
 9
 As an example, applying the Agreement to a typical case, Major's in its brief on appeal summarized an account transaction of one of its customers (William Jones) as follows:
 
 
 10
 A customer (Jones) of Major's (later designated Account No. 15,915) purchased furniture from Major's worth $1700.00 (or more). * (H)e executed an installment payment agreement with Major's in the total face amount of $2549.88, including interest and insurance costs. . . . Using this piece of chattel paper, . . . Major's engaged in a financing transaction with Castle under the Agreement. . . . Major's delivered the Jones' chattel paper with a $2549.88 face amount of Castle together with an assignment of rights. Shortly thereafter, Castle delivered to Major's cash in the amount of $1224.00. The difference between this cash amount and the full face of the chattel paper in the amount of $2549.88, consisted of the following costs and deductions by Castle:
 
 
 11
 1. $180.00 discount credited to a "reserve" account of Major's.
 
 
 12
 2. $300.06 "discount" (actually a prepaid interest charge).
 
 
 13
 3. $30.85 for life insurance premium.
 
 
 14
 4. $77.77 for accident and health insurance premium.
 
 
 15
 5. $152.99 for property insurance premium.
 
 
 16
 6. $588.27 interest charged to Jones on the $1700 face of the note (App. 73a No. 15,915).
 
 
 17
 Thus, as to the Jones' account, Castle received and proceeded to collect a piece of chattel paper with a collectible face value of $2549.88. Major's received $1224.00 in cash.
 
 
 18
 Brief of Appellee at 5-6.
 
 
 19
 As we understand the Agreement, if Jones in the above example defaulted without having made any payments on account, the very least Major's would have been obliged to pay on repurchase would be $1,700 even though Major's had received only $1,224 in cash on transfer of the account and had been credited with a reserve of $180. The repurchase price was either charged fully to reserve or, as provided in the Agreement, 50% To reserve and 50% By cash payment from Major's (P 10). In the event of bankruptcy, default under the agreement or discontinuation of business, Major's was required to repurchase all outstanding accounts immediately (P 13). Finally, the Agreement provided that the law of Pennsylvania would govern and that the Agreement could not be modified except in writing signed by all the parties. (Apparently, no objection has ever been made to Castle's unilateral modification of the discount rate. See p. 546 Infra. That issue is not before us.)
 
 
 20
 Under the Agreement, over 600 accounts were transferred to Castle by Major's of which 73 became delinquent and subject to repurchase by Major's. On March 21, 1975, Castle notified Major's that Major's was in default in failing to repurchase delinquent accounts (App. 52). Apparently to remedy the default, Major's deposited an additional $10,000 into the reserve.[8] After June 30, 1975, Major's discontinued transferring accounts to Castle (App. 51). On October 7, 1975 Castle again declared Major's in default (App. 53).
 
 
 21
 Major's' action against Castle alleged that the transaction by which Major's transferred its accounts to Castle constituted a financing of accounts receivable and that Castle had collected a surplus of monies to which Major's was entitled. We are thus faced with the question which we posed at the outset of this opinion: did the June 18, 1973 Agreement create a Secured interest in the accounts, or did the transaction constitute a True sale of the accounts? The district court, contrary to Castle's contention, refused to construe the Agreement as one giving rise to the sales of accounts receivable. Rather, it interpreted the Agreement as creating a security interest in the accounts which accordingly was subject to all the provisions of Article 9 of the U.C.C., 12A P.S. § 9-101 Et seq. It thereupon entered its order of June 13, 1977 granting Major's' motion for summary judgment and denying Castle's motion for summary judgment. This order was ultimately incorporated into the court's final judgment entered May 5, 1978 which specified the amount of surplus owed by Castle to Major's. It was from this final judgment that Castle appealed.
 
 
 22
 Castle on appeal argues (1) that the express language of the Agreement indicates that it was an agreement for the sale of accounts and (2) that the parties' course of performance and course of dealing compel an interpretation of the Agreement as one for the sale of accounts. Castle also asserts that the district court erred in "reforming" the Agreement and in concluding that the transaction was a loan. In substance these contentions do no more than reflect Castle's overall position that the Agreement was for an absolute sale of accounts.
 
 II
 
 23
 Our analysis starts with Article 9 of the Uniform Commercial Code which encompasses both Sales of accounts and Secured interests in accounts. Thus, the Pennsylvania counterpart of the Code "applies . . . (a) to any transaction (regardless of its form) which is intended to create a security interest in . . . accounts . . . ; and also (b) to any sale of accounts . . ." 12A P.S. § 9-102.[9] The official comments to that section make it evident that Article 9 is to govern All transactions in accounts. Comment 2 indicates that, because "(c)ommercial financing on the basis of accounts . . . is often so conducted that the distinction between a security transfer and a sale is blurred," that "sales" as well as transactions "intended to create a security interest" are subject to the provisions of Article 9. Moreover, a "security interest" is defined under the Act as "any interest of a buyer of accounts." 12A P.S. § 1-201(37). Thus even an outright buyer of accounts, such as Castle claims to be, by definition has a "security interest" in the accounts which it purchases.
 
 
 24
 Article 9 of the Pennsylvania Code is subdivided into five parts. Our examination of Parts 1-4, 12A P.S. §§ 9-101 to 9-410, reveals no distinction drawn between a sale and a security interest which is relevant to the issue on this appeal. However, the distinction between an outright sale and a transaction intended to create a security interest becomes highly significant with respect to certain provisions found in Part 5 of Article 9. That part pertains to default under a "security agreement."[10] 12A P.S. § 9-501, Et seq.
 
 
 25
 The default section relevant here, which distinguishes between the consequences that follow on default when the transaction Secures an indebtedness rather than a Sale, provides:
 
 
 26
 A secured party who by agreement is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor and who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections. If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency. But, If the underlying transaction was a sale of accounts, contract rights, or chattel paper, The debtor is entitled to any surplus or is liable for any deficiency Only if the security agreement so provides.
 
 
 27
 12A P.S. § 9-502(2) (emphasis added).
 
 
 28
 Thus, if the accounts were transferred to Castle To secure Major's' indebtedness, Castle was obligated to account for and pay over the surplus proceeds to Major's under 12A P.S. § 9-502(2), as a debtor's (Major's') right to surplus in such a case cannot be waived even by an express agreement. 12A P.S. § 9-501(3)(a). On the other hand, if a Sale of accounts had been effected, then Castle was entitled to all proceeds received from all accounts because the June 18, 1973 Agreement does not provide otherwise.
 
 
 29
 However, while the Code instructs us as to the consequences that ensue as a result of the determination of "secured indebtedness" as contrasted with "sale," the Code does not provide assistance in distinguishing between the character of such transactions. This determination, as to whether a particular assignment constitutes a sale or a transfer for security, is left to the courts for decision. 12A P.S. § 9-502, Comment 4. It is to that task that we now turn.
 
 III
 
 30
 Castle contends that because the June 18, 1973 Agreement expressly refers only to "sales" and "purchases" that the parties intended a true "sale" of accounts and not a security transfer. However, it has been held in Pennsylvania, as it has elsewhere, that
 
 
 31
 "Courts will not be controlled by the nomenclature the parties apply to their relationship": Kelter, Tr. v. American Bankers' Finance Co., 306 Pa. 483, 492, 160 A. 127, 130, 82 A.L.R. 999. In Smith-Faris Company v. Jameson Memorial Hospital Association, 313 Pa. 254, 260, 169 A. 233, 235, it was said: " 'Neither the form of a contract nor the name given it by the parties controls its interpretation. In determining the real character of a contract courts will always look to its purpose, rather than to the name given it by the parties. * * * The proper construction of a contract is not dependent upon any name given it by the parties, or upon any one provision, but upon the entire body of the contract and its legal effect as a whole.' 6 R.C.L., p. 836 § 226."
 
 
 32
 Capozzoli v. Stone & Webster Engineering Corporation, 352 Pa. 183, 42 A.2d 524, 525 (1945). See also In re Joseph Kanner Hat Co., Inc., 482 F.2d 937, 940 (2d Cir. 1973) ("(C)ourts will determine the true nature of a security transaction, and will not be prevented from exercising their function of judicial review by the form of words the parties may have chosen.").
 
 
 33
 It thus became the district court's task, as it is now ours, to examine the record developed by the parties in order to determine whether the transactions in question in fact constitute true sales or security interests. See Lyon v. Ty-Wood Corporation, 212 Pa.Super. 69, 239 A.2d 819 (1968).
 
 
 34
 In normal course the examination of the parties' business activities, objectives and relationship are matters best left to trial and the fact-finder after evidence has been presented. In the various cases to which we refer Infra, such determinations were made only after trial. Here, however, the proceeding developed somewhat differently. Both parties moved for summary judgment as to Count I the one count which concerns the character of the transaction. Castle submitted an affidavit which incorporated various pleadings and an interrogatory answered by Major's. When questioned by the court at a hearing held on June 13, 1977 to the following effect
 
 
 35
 . . . are you in accord and agreement that, as to Count I, that I have before me all of the facts which not only have been adduced to date but could possibly be adduced, whether there be further discovery or whether they be adduced at trial itself so that as a matter of law I have before me all the facts upon which I can make a decision upon the cross-motions for summary judgment which have been submitted by you on Count I. Yes or no.
 
 
 36
 both Castle and Major's agreed that no other facts were needed. Not content with this representation, the court again inquired:
 
 
 37
 Is there anything that you believe that could be further adduced by way of live testimony at a trial itself that would shed any additional factual light on this motion or are you satisfied that as a matter of law I have before me all that I need to decide the motions with respect to Count I?
 
 
 38
 Transcript June 13, 1977, pp. 8-9. Both parties again answered that there was nothing further in the way of evidence that they desired to produce, or that the court required in order to make its determination.
 
 
 39
 Accordingly, the district court judge having been assured, and then reassured, that only the matters then in the record before him were to be considered, and that there were no other facts that bore upon the issue, undertook to answer the question at issue on this appeal: i.e., was the transaction a sale or a secured interest? We too are therefore remitted to the same record: the Agreement and those documents on which the district court relied. Our examination of that record and the legal principles pertinent to that issue satisfies us that the district court did not err.
 
 IV
 
 40
 The comments to § 9-502(2) (and in particular Comment 4) make clear to us that the presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest. Hence, one of Major's arguments which is predicated on such a Per se principle attracts us no more than it attracted the district court. The Code comments however are consistent with and reflect the views expressed by courts and commentators that "(t)he determination of whether a particular assignment constitutes a (true) sale or a transfer for security is left to the courts." 12A P.S. § 9-502, Comment 4. The question for the court then is whether the Nature of the recourse, and the true nature of the transaction,[11] are such that the legal rights and economic consequences of the agreement bear a greater similarity to a financing transaction or to a sale.
 
 
 41
 In In re Joseph Kanner Hat Co., Inc., 482 F.2d 937 (2d Cir. 1973), Kanner having obtained a loan of $25,000 from a bank executed an assignment to the bank of $25,000 which was due Kanner from the Norwalk Redevelopment Agency and represented compensable moving expense. The assignment reads "That Joseph Kanner Hat Company, Inc. . . . in consideration of the sum of $25,000.00 . . . does hereby sell, assign and transfer . . . any and all sums of money due and owing . . . the said assignor by . . . the Norwalk Redevelopment Agency . . . ." 482 F.2d at 938 n.4. The bank contended that the assignment constituted a transfer of an absolute right to collect whatever monies were due Kanner from the Redevelopment Agency. Kanner's trustee in bankruptcy claimed that the transaction created no more than a security interest under the Connecticut Commercial Code, that the security interest had not been perfected by filing, and that the trustee's interest was entitled to priority over the bank's. The Second Circuit, looking to the true nature of the transaction, did not consider itself restricted by the form of words used by the parties. Noting that the bank regarded and treated the assignment as a method of payment of a loan, the court held that despite the "absolute assignment" of the entire claim, the transaction was no more than an assignment for security.
 
 
 42
 In Kelter v. American Bankers' Finance Co., 306 Pa. 483, 160 A. 127 (1932), the Integrity Construction Company, a general contractor, had borrowed money from American Bankers' Finance Company. The money was loaned to Integrity in exchange for the transfer of contracts made between independent home owners and Integrity. The contracts of the property owners were "sold, assigned and transferred" by Integrity to American Bankers' by a writing which, among other things, specified that Integrity had completed the work required, and that Integrity guaranteed that all the monies due under the contracts would be promptly paid. Ultimately, Integrity was adjudicated a bankrupt and the trustee of Integrity's estate obtained an order restraining American Bankers' from collecting or applying to its use any of the funds becoming due on the contracts which Integrity had transferred to it. Recognizing that the central question was whether the transaction between Integrity and American Bankers' constituted a sale of the contracts or merely loans secured by the assignments, the court reviewed the course of dealings between the parties and, in holding in favor of the bankruptcy trustee that the transactions were no more than loans secured by the collateral of the assigned contracts, stated:
 
 
 43
 "It is true that the letters exchanged (which constitute the contracts) speak of 'money advanced' and they provide for 'finance charges' on the money advanced and for 'searches' made in the lender's interest. On profitable contracts a balance was paid by the so-called 'buyer' of the contract to the alleged 'seller.' We cannot reconcile the payment of interest and finance charges, nor of the buyer's expenses in 'searches' with the idea that the contractor had sold his contract to the banker. The parties may call this what they please. It is in fact nothing but a loan upon the collateral of the assigned contract."
 
 
 44
 In cases of this kind it is more important what parties actually do than what they say they do.
 
 
 45
 160 A. at 130.
 
 
 46
 Lyon v. Ty-Wood Corporation, 212 Pa.Super. 69, 239 A.2d 819 (1968), is consistent with the approach taken in Kanner and Kelter. On the record presented in Lyon, the court, "after a long and careful weighing of all of the evidence," held that the assignments constituted a sale rather than a security interest.
 
 
 47
 Hence it appears that in each of the cases cited, despite the express language of the agreements, the respective courts examined the parties' practices, objectives, business activities and relationships and determined whether the transaction was a sale or a secured loan only after analysis of the evidence as to the true nature of the transaction. We noted earlier that here the parties, satisfied that there was nothing other than the Agreement and documents bearing on their relationship (Part III, Supra ), submitted to the court's determination on an agreed record. The district court thereupon reviewed the Agreement and the documents as they reflected the conduct of the parties to determine whether Castle treated the transactions as sales or transfers of a security interest. In referring to the extremely relevant factor of "recourse"[12] and to the risks allocated, the district court found:
 
 
 48
 In the instant case the allocation of risks heavily favors Major's claim to be considered as an assignor with an interest in the collectibility of its accounts. It appears that Castle required Major's to retain all conceivable risks of uncollectibility of these accounts. It required warranties that retail account debtors e. g., Major's customers meet the criteria set forth by Castle, that Major's perform the credit check to verify that these criteria were satisfied, and that Major's warrant that the accounts were fully enforceable legally and were "fully and timely collectible." It also imposed an obligation to indemnify Castle out of a reserve account for losses resulting from a customer's failure to pay, or for any breach of warranty, and an obligation to repurchase any account after the customer was in default for more than 60 days. Castle only assumed the risk that the assignor itself would be unable to fulfill its obligations. Guaranties of quality alone, or even guarantees of collectibility alone, might be consistent with a true sale, but Castle attempted to shift all risks to Major's, and incur none of the risks or obligations of ownership. It strains credulity to believe that this is the type of situation, referred to in Comment 4, in which "there may be a true sale of accounts . . . . although recourse exists." When we turn to the conduct of the parties to seek support for this contention, we find instead that Castle, in fact, treated these transactions as a transfer of a security interest.
 
 
 49
 449 F.Supp. at 543.
 
 
 50
 Moreover, in looking to the conduct of the parties, the district court found one of the more significant documents to be an August 31, 1973 letter written by Irving Canter, President of Castle Credit, to Major's. As the district court characterized it, and as we agree:
 
 
 51
 This letter, in effect, announces the imposition of a floating interest rate on loans under a line of credit of $80,000 per month, based upon the fluctuating prime interest rate. The key portion of the letter states:
 
 
 52
 Accordingly, your volume for the month of September cannot exceed $80,000. Any business above that amount will have to be paid for in October. I think you'll agree that your quota is quite liberal. The surcharge for the month of September will be 3% Of the principal amount financed which is based upon a 91/2% Prime rate. On October 1, and for each month thereafter, the surcharge will be adjusted, based upon the prime rate in effect at that time as it relates to a 61/2% Base rate. . . .
 
 
 53
 This unilateral change in the terms of the Agreement makes it obvious that Castle treated the transaction as a line of credit to Major's i.e., a loan situation. Were this a true sale, as Castle now argues, it would not have been able to impose these new conditions by fiat. Such changes in a sales contract would have modified the price term of the agreement, which could only be done by a writing signed by all the parties.
 
 
 54
 449 F.Supp. at 543.
 
 
 55
 It is apparent to us that on this record none of the risks present in a true sale is present here. Nor has the custom of the parties or their relationship, as found by the district court, given rise to more than a debtor/creditor relationship in which Major's' debt was secured by a transfer of Major's' customer accounts to Castle, thereby bringing the transaction within the ambit of 12A P.S. § 9-502. To the extent that the district court determined that a surplus existed, Castle was obligated to account to Major's for that surplus and Major's' right to the surplus could not be waived, 12A P.S. § 9-502(2). Accordingly, we hold that on this record the district court did not err in determining that the true nature of the transaction between Major's and Castle was a secured loan, not a sale.
 
 V
 
 56
 Castle also contends that even if its transactions with Major's are construed to be secured transfers rather than sales, the district court nevertheless incorrectly calculated the amount of surplus due Major's, and improperly set off a $15,000 obligation claimed by Castle. We have carefully reviewed the record and the district court's judgment[13] in light of its analysis. We are satisfied that the district court correctly dealt with all of Castle's contentions and did not err in its conclusions.
 
 VI
 
 57
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 Summary judgment under Fed.R.Civ.P. 56(b) may only be granted where the facts are not in dispute. As both parties stipulated that the facts relevant to Count I were not in dispute, (See infra Part III) we shall limit our discussion of the factual background to the parties' stipulated factual statement. (Appellee's Supplemental App. 11b-13b)
 
 
 [2]
 Counts II and III of Major's complaint and Castle's counterclaim, while collaterally related in some aspects to the order from which appeal was taken, are not before us on this appeal. Both counts of the complaint and Castle's counterclaim were decided in favor of Castle by a jury verdict. No appeal was taken from that determination by Major's. Hence all issues between the parties have been concluded and we have jurisdiction pursuant to 28 U.S.C. § 1291
 
 
 [3]
 The parties do not dispute that their rights are governed by the law of Pennsylvania. The Pennsylvania Uniform Commercial Code, and in particular 12A P.S. § 9-105, classifies the accounts receivable which are the subject of the agreement as "chattel paper."
 
 
 [4]
 According to Major's brief, the "face amount" of its customers' installment payment agreements included (1) the retail cost of the furniture purchased (amount financed), (2) the total amount of interest payable by the customer over the life of the customer's installment payment agreement, and (3) insurance charges
 
 
 [5]
 The 15% "discount" was subsequently increased unilaterally by Castle to 18% And thereafter was adjusted monthly to reflect changes in the prime rate (Appellee's Supplemental Appendix 3b-4b)
 
 
 [6]
 It becomes apparent from a review of the record that the amount which Castle actually paid to Major's on each account transferred was the unpaid face amount exclusive of interest And exclusive of insurance premiums less 28% (18% "discount" and 10% Reserve)
 In its brief on appeal, Castle sets out the following summary of the transactions that took place over the relevant period. It appears that the face amount of the accounts which were "sold" by Major's to Castle was $439,832.08, to which finance charges totalling $116,350.46 and insurance charges totalling $42,304.03 were added, bringing the total amount "purchased" by Castle to $598,486.57. For these "purchases" Castle paid Major's $316,107. Exclusive of any surplus as determined by the district court Castle has retained $528,176.13 which it has received as a result of customer collections and repurchases by Major's. Collection costs were found by the district court to be $1,627.81.
 
 
 [7]
 The Rule of 78 is "the predominant method used to determine refunds of unearned finance charges upon prepayment of consumer debts." Hunt, James H., "The Rule of 78: Hidden Penalty for Prepayment in Consumer Credit Transactions," 55 B.U.L.Rev. 331, 332 (1975). That article points out that the Rule of 78 allocates a disproportionately large portion of finance charges to the early months of a credit transaction which produces a hidden penalty for prepayment, although the extent of the penalty diminishes as the term of the debt nears expiration
 Apparently a rebate of insurance premiums was provided as well as a rebate of interest. See N.T. 6-94-99 and Appellant's Brief at 21.
 
 
 *
 Some transactions involved cash downpayment to Major's, but this is not at issue in the law suit
 
 
 [8]
 This "deposit" was effected through the mechanism of a promissory note to Castle dated April 25, 1975 in the amount of $40,000, of which $10,000 was credited to reserve
 
 
 [9]
 The exceptions contained in 12A P.S. § 9-103 and § 9-104 are not applicable here and the parties do not contend otherwise
 
 
 [10]
 A "security agreement" is "an agreement which creates or provides for a security interest." 12A P.S. § 9-105(1)(h)
 
 
 [11]
 In re Joseph Kanner Hat Co., Inc., 482 F.2d 937, 940 (2d Cir. 1973); Lucius Beebe & Sons, Inc. v. Wason, 274 Mass. 254, 174 N.E. 500 (1931); Bacon v. Kienzel, 21 A. 37 (N.J.Chan.1891). Cf. Lyon v. Ty-Wood Corporation, 212 Pa.Super. 69, 239 A.2d 819 (1968)
 
 
 [12]
 Gilmore, in commenting on the Code's decision to leave the distinction between a security transfer and a sale to the courts, would place almost controlling significance on the one factor of recourse. He states:
 If there is no right of charge-back or recourse with respect to uncollectible accounts and no right to claim for a deficiency, then the transaction should be held to be a sale, entirely outside the scope of Part 5. If there is a right to charge back uncollectible accounts (a right, as § 9-502 puts it, of "full or limited recourse") or a right to claim a deficiency, then the transaction should be held to be for security and thus subject to Part 5 as well as the other Parts of the Article.
 II Gilmore, Security Interests in Personal Property, § 44.4 at 1230.
 Here, of course, the Agreement provided Castle with full recourse against Major's.
 
 
 [13]
 Part V of the district court's opinion, "Judgment," recites the details of the transactions resulting in a surplus in favor of Major's of $66,197.38 as follows:
 I. COLLATERAL HELD BY CASTLE
Item 1. Total Accounts Receivable $596,901.88
Item 2. Uncollected Accounts Rec. 70,310.44
 -----------
Line A: Net Value of Collateral 526,591.44
II. MAJOR'S OBLIGATIONS TO CASTLE
Item 3. Payments by Castle 316,107.42
Item 4. Deductions 77,957.35
Item 5. Charges to Reserve 22,972.28
Item 6. Insurance 42,304.03
Item 7. Collection Costs 1,627.81
 -----------
Line B: Total Obligations 460,968.89
III. ACCOUNTING OF SURPLUS 65,622.55
IV. COUNTERCLAIM
Item 8. Loan and Costs 15,000.00
Item 9. "Flipped" accounts 4,386.93
Item 10. Collections 555.00
 -----------
Line C: Net 10,058.07
V. MISCELLANEOUS OBLIGATIONS TO MAJOR'S
Item 11. Loan 10,000.00
Item 12. Insurance Overcharge 632.90
 -----------
Line D: Total 10,632.90
Total owing to Major's (Line A &
 Line D) 537,224.34
Total owing to Castle (Line B &
 Line C) 471,026.96
 -----------
 $66,197.38
 Amount of Judgment $66,197.38
 
 
 [449]
 F.Supp. at 547
 
 
 [449]
 F.Supp. at 547
 The final order reflecting that judgment and the manner in which collections and payments were to ensue was dated May 1, 1978 and entered May 5, 1978. It reads:
 AND Now, this 1st day of May, 1978, upon full consideration of the entire record, including the cross-motions for summary judgment on Count I, the briefs, reply briefs and affidavits in support thereof, the briefs, reply briefs, affidavits, and letters with respect to a final account, the matters raised at oral argument held on December 20, 1977, and our Order entered June 13, 1977, it is hereby ORDERED that:
 
 
 [1]
 Judgment is entered herein in favor of Major's Furniture Mart, Inc. and against defendant Castle Credit Corporation in the amount of $66,197.38;
 
 
 [2]
 Castle Credit Corporation shall continue to collect any and all outstanding amounts owing from account debtors in the numbered accounts listed in the 17 page accounting filed in this docket and in the list attached to the August 1975 Loan Agreement between the parties and shall do so in a commercially reasonable manner;
 
 
 [3]
 The total proceeds from these collections from and after August 1, 1977, shall be deposited in a separate interest bearing escrow account of Castle Credit Corporation and the total accumulated amount in such account, together with interest thereon, less the reasonable costs of collection, shall be paid over to Major's Furniture Mart, Inc. by check made payable to Major's Furniture Mart, Inc. and delivered c/o Robert W. Maris, Esquire, 2600 The Fidelity Building, Philadelphia, Pa., 19109, on or before June 30, 1978, and upon the final day of each successive 90 day period thereafter so long as there shall continue to be any proceeds from said accounts receivable; and
 
 
 [3]
 (sic) Castle Credit Corporation shall also make a reasonable effort to ascertain what, if any, amounts have been collected on those accounts, referred to in counsels' letter of April 28, 1978, as being held for collection, with a face value of $5,899.44, and pay over to Major's Furniture Mart any amounts which Castle has actually collected on these accounts, less the reasonable costs of collection