John H. DOOLAN and Thomas H. Doolan

v.

DOOLAN STEEL CORPORATION, a wholly owned subsidiary of Coutinho, Caro & Co.

COUTINHO, CARO & CO., INC.

v.

John H. DOOLAN and Thomas H. Doolan.

Civ. A. Nos. 84–0009, 84–0780.

United States District Court, E.D. Pennsylvania.

Aug. 15, 1984.

Joseph Fioravanti, Philadelphia, Pa., for the Doolans.

J. Grant McCabe, Philadelphia, Pa., for Coutinho, Caro & Co., Inc.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

Two separate actions have been consolidated for trial before this court. Both actions arise from the same factual basis. The respective plaintiffs have filed motions for summary judgment, and have agreed to a Stipulation of Facts for purposes of the summary judgment motions only. The parties have stipulated that New Jersey law is controlling. The general background of the cases as set forth in the Stipulation of Facts is as follows.

John H. Doolan and Thomas H. Doolan ("Doolans"), residents of Pennsylvania, entered into a purchase agreement with Coutinho, Caro & Co., Inc. ("CCC"), a German corporation, on October 26, 1979, whereby CCC agreed to purchase shares of stock and assets of certain companies ("Doolan interests") in which the Doolans were partners, stockholders and/or officers. On that date the Doolan interests merged into Doolan Steel Corporation ("DSC"). DSC is a Delaware corporation with its principal place of business in New Jersey and is a wholly owned subsidiary of CCC. The Doolans were retained as corporate officers and as trustees of the pension and profit sharing plans already in effect. In the purchase agreement a variety of representations and warranties were made by both parties concerning assets and liabilities. These extended beyond October 26, 1979, for the full period of any statute of limitations

On April 27, 1983, the Doolans retired from employment with DSC, the terms of which were embodied in a letter agreement. The terms of the letter agreement stipulate that each of the Doolans was entitled to payment of benefits from the DSC Pension Plan and the DSC Profit Sharing Plan.

The action brought by the Doolans requests liquidated damages from DSC for its allegedly untimely payment of profit sharing plan retirement benefits per the letter agreement signed by the parties on April 27, 1983. The action brought by CCC requests reimbursement from the Doolans for workmen's compensation retroactive premium adjustment insurance expenses paid by DSC allegedly for the pre-acquisition liability of the Doolans.

For the reasons which follow we grant the motion of the Doolans for summary judgment in an amount determined by this court, and deny the motion of CCC for summary judgment.

 To prevail upon a motion for summary judgment the moving party must conclusively demonstrate to the court's satisfaction that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law, Fed.R.Civ.P. 56(c), *Majors Furniture Mart, Inc. v. Castle Credit Corp., Inc.*, 602 F.2d 538, 539 (3d Cir.1979); *Drexel v. Union Prescription Center, Inc.*, 582 F.2d 781, 784 (3d Cir.1978). We must view the evidence in the light most favorable to the party opposing the motion. *Bishop v. Wood*, 426 U.S. 341, 347 n. 11, 96 S.Ct. 2074, 2079 n. 11, 48 L.Ed.2d 684 (1976); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Drexel v. Union Prescription Centers, Inc., supra*, at 784.

## MOTION OF THE DOOLANS FOR SUMMARY JUDGMENT

The Stipulation of Facts entered into by the parties details that on April 27, 1983 the Doolans retired from employment with DSC. The terms of the retirement were embodied in a letter agreement which detailed the procedures to be followed by the Doolans and DSC. The Doolans were entitled to both pension and profit sharing benefits.

On April 25, 1983, at the request of DSC officers, John Wegmann, treasurer/controller of DSC, transmitted a letter to Connecticut General Life Insurance Company ("CG") requesting disbursements in the amount of $869,048 from the DSC Pension Plan and $299,000 from the DSC Profit Sharing Plan for benefits payable to the Doolans. In that letter, Wegmann stated that he had to estimate the Profit Sharing Plan values because he had not yet received from CG the 12/31/82 statement of

the current valuations of the Profit Sharing Plan. On April 29, 1983, DSC received from CG a letter enclosing the 12/31/82 Profit Sharing Plan account information. On May 3, 1983, Mr. Weberbauer, vice-president of DSC, sent a letter to CG requesting a detail of both interest and charges for the Profit Sharing Plan accounts because the net interest credited for 1982 as per the yearly statement was far below the stated interest rates for the year.

On or about May 18, 1983, DSC received from CG the requested Pension Plan and Profit Sharing funds. The profit sharing funds were deposited on June 3, 1983 by DSC into a Merrill Lynch Ready Assets Trust account to the benefit of the "Doolan Steel Corp. Profit Sharing Plan." On June 23, 1983, the Doolans were paid their pension plan benefits.

On July 7, 1983, CG notified Mr. Weberbauer by letter that it was in the process of calculating the interest credited to the Profit Sharing Fund as of 12/31/82. A copy of CG's letter was sent to John Doolan on July 11, 1984.

On or about August 19, 1983, Mr. Hueskin, an officer of DSC sent a letter to John Doolan in which he stated that the workmen's compensation assessments paid by DSC were due from the Doolans and that he hoped the matter could be resolved before the final numbers on the Profit Sharing funds were received from CG.

On September 23, 1983, DSC received the updated valuation statements for the Profit Sharing Plan from CG. On September 27, 1983, DSC sent separate checks to the Doolans amounting to $299,114.37 representing disbursement of the profit sharing benefits.

There are no genuine issues of fact in the case *sub judice* when the evidence is viewed in the light most favorable to the party opposing the motion. Both parties agree that the letter agreement entered into by the parties on April 27, 1983, for the Doolans retirement is valid, and we must therefore accept it as the final expression of the parties' agreement, *Restatement of Contracts 2d*, Sec. 209. But it is at this point that the parties disagree.

Plaintiffs (Doolans) contend that the terms of the letter agreement, paragraph 4, detail the procedures to be followed for the distribution of the pension and profit sharing funds. By these terms the profit sharing plan distribution was to be valued by Mr. Wegmann, the controller-treasurer of DSC, subject only to verification by DSC's outside accountants at the request of the parties. The pension plan valuation was to be performed by the outside accountants. By April 25, 1983, both valuations were completed and on that date Mr. Wegmann mailed a request for both amounts to CG. CG promptly remitted these funds and on June 23, 1983, the pension plan benefits were distributed to the Doolans, but on June 3, 1983, the Profit Sharing funds were deposited to a Merrill Lynch account under the control of DSC.

The Doolans contend that the time frame for the profit sharing distribution was dependent upon the pension plan distribution. They specifically point to language in paragraph 4 which states that "payment of your lump-sum benefits under the DSC Profit Sharing Plan will be made no later than the time payment is made under the Pension Plan." As pension benefits were paid on June 23, 1983, plaintiffs contend that this was also the due date for distribution of the profit sharing benefits.

█ The Doolans were not paid their profit sharing benefits until September 27, 1983. Therefore, they contend that the liquidated damage clause (paragraph 7) of the letter agreement must be given effect. Paragraph 7 in pertinent part provides:

> Should the entire amounts of the lump sum distributions not be *timely* received in accordance with Paragraph 4 of this letter agreement, ... DSC will pay ... as liquidated damages:
>
> (i) in the case of *failure* to make up lump sum distributions under the Plans, an amount equal to the product of the amount which you would have received if the Plans had been terminated multiplied by 1.6, plus interest. ...

Under New Jersey law, the parol evidence rule bars the admission of extrinsic evi-

dence when the language of the contract is clear and unambiguous. *Zone Co. v. Service Transportation Co.*, 137 N.J.L. 112, 57 A.2d 562 (1948). Further, where the parties to a contract specifically set forth the conditions of performance, they are necessarily bound by those terms. *Lippincott v. Content*, 123 N.J.L. 277, 8 A.2d 362 (1939).

We find the letter agreement to be very clear concerning the triggering of the liquidated damages clause. Paragraph 7 states that should the distribution not be "timely" received DSC will pay liquidated damages. The only reference to time requirements for the distribution of the profit sharing fund is explicitly stated in paragraph 4 to be no later than the distribution of the pension fund which was on June 23, 1983. Thus, we find that to meet the express terms of the letter agreement, the profit sharing distribution must have been paid by June 23, 1983, the date of the pension plan distribution.

Defendants offer various arguments in opposition to Doolans' claims, but we determine that these arguments are without merit. They read the liquidated damages clause to take effect only "in the case of *failure* to make up lump-sum distributions under the Plan. . . ." *Motion of Defendant Doolan Steel Corporation for Summary Judgment on Plaintiffs' Claims*, page 6. Defendants completely disregard the portion of the same paragraph which explicitly makes reference to "timely" distribution in accordance with paragraph 4.

Defendants also claim that by the express terms of paragraph 4 they were only required to pay an amount equal to vested benefits on the date of retirement. They claim that the correspondence with CG over the time period from April 24 to September 23, concerning the interest accumulations proves that the profit sharing benefits to be distributed were not finalized and therefore could not be paid on June 23, 1983. This position is without support. First, paragraph 4 specifically states that Mr. Wegmann was to calculate the profit sharing benefits payable to the Doolans subject to verification by the outside accountants only at the request of any party to this

agreement. Mr. Wegmann had completed this valuation on April 25, 1983. Defendants claim that this valuation cannot stand because it was completed two days prior to the final agreement is also untenable as this valuation was made in anticipation of the agreement being entered into and the amount calculated by Mr. Wegmann was finally paid to the Doolans.

Second, we can see no benefit to be gained by DSC's withholding of the profit sharing benefits. It is undisputed that CG had not timely filed its yearly reports with DSC and as a result DSC was forced to estimate such benefits. But had the Doolans received an overpayment, CG would only have recourse against the Doolans, not DSC. Therefore, DSC's reasoning is not valid.

█ Thus we find that DSC was required to distribute the profit sharing funds to the Doolans on June 23, 1983, the date of the pension fund distribution. Because DSC failed to do so, the liquidated damage clause takes effect.

### LIQUIDATED DAMAGES

The liquidated damages clause provides for damages of 60% of the total amount of profit sharing benefits due plus interest calculated at the prime rate of First Pennsylvania Bank and Trust Co., N.A. for the delinquent period. The interest has been stipulated by the parties to be 10.76% per annum. The total liquidated damages claim is $192,684.80 plus interest at 10.76% per annum from June 23, 1983 to September 27, 1983.

Under New Jersey law, in evaluating liquidated damages clauses there initially must be an inquiry to determine whether the contract clause provides for the imposition of a penalty or is actually a legitimate forecast of damages to be incurred from a breach.

█ A penalty is the sum a party agrees to pay in the event of a breach but which is not a pre-estimate of probable actual damages, but a punishment, the threat of which is designed to prevent the breach. *West-*

*mont Country Club v. Kameny*, 82 N.J. Super. 200, 197 A.2d 379 (App.Div.1964). In *Westmont* the court provided a test to determine whether a liquidated damage clause is actually a penalty:

> An agreement made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable, for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimate.

However, the tendency now is to look with favor upon liquidated damages provisions in agreements. Such tendency rests upon the proposition that a bargain struck by the parties after arms-length negotiation should be recognized and enforced where it represents a good faith effort to estimate in advance the damages which would be sustained by a party in the event of a breach. *D.H.M. Industries v. Central Port Warehouse*, 127 N.J.Super. 499, 503, 318 A.2d 20 (App.Div.1973), aff'd 64 N.J. 548, 318 A.2d 19 (1974). See *Ellis v. Lionikis*, 152 N.J.Super. 321, 377 A.2d 1208 (Ch.Div.1977), 162 N.J.Super. 579, 394 A.2d 116 (App.Div.1978).

We recognize that the agreement in question was negotiated by parties of equal bargaining ability after arms-length negotiations. However, even when we weigh such evidence in light of the tendency under New Jersey law to look with favor upon liquidated damages provisions, we find that the liquidated damages clause in question does not meet the test enunciated in *Westmont*.

The *Westmont* test requires that for a liquidated damages clause to be given effect the amount specified must be a reasonable forecast of just compensation for the harm caused by the breach and the damages must be very difficult to estimate. We determine that liquidated damages of 60% of the total profit sharing benefits due, $192,684.80, is not a reasonable forecast of just compensation for the harm caused by the breach. We are aware that

the Doolans may have been able to invest the funds in more speculative ventures than interest bearing deposits. But a 60% return as a result of a liquidated damages clause is unconscionable, especially when the funds were delayed by only three months. We therefore decline to give effect to that part of the liquidated damages clause as we determine it to be a penalty. However, the plaintiffs are entitled to prejudgment interest.

### PREJUDGMENT INTEREST

The relevant time period for prejudgment interest is from June 23, 1983, the date the retirement benefits were due until September 27, 1983, the date of distribution.

Under New Jersey law, the rule regarding prejudgment interest is that if the damages are liquidated and capable of ascertainment by computation then prejudgment interest may be awarded to the aggrieved party regardless of a good faith belief or colorable claim by the breaching party that an obligation did not exist to pay the liquidated amount. See *Jos. L. Muscarelle, Inc. v. Central Iron Mfg. Co.*, 379 F.2d 715 (3d Cir.1967); *Rova Farms Resort v. Investors Insurance Co.*, 65 N.J. 474, 506, 323 A.2d 495, 512 (1974). Such rule recognizes that a successful claimant should be compensated for the loss the monies due would presumably have earned if payment had not been delayed. *Busik v. Levine*, 63 N.J. 351, 307 A.2d 571 (1973), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). It is also clear from New Jersey law that the trial court is vested with broad discretion to allow prejudgment interest in accordance with equitable principles. See *Manning Engineering, Inc. v. Hudson City Park Commission*, 71 N.J. 145, 159, 364 A.2d 1 (1976), vacated on other grounds 74 N.J. 113, 376 A.2d 1194 (1977). See *Tobin v. Jersey Shore Bank*, 189 N.J.Super. 411 (App.Div.1983), 460 A.2d 195 (N.J.Super.A.D.1983).

In the present case, neither the fact of the debt nor its principal amount were in dispute. The only substantial

question was the applicability of the liquidated damages clause. Thus, we determine that it is equitable to award prejudgment interest for the period from June 23, 1983 to September 27, 1983.

If the liquidated damages clause had been given effect, the rate of interest applied would have been 10.76% which reflects the prime rate of interest at First Pennsylvania Bank during the relevant time. Since this rate was fixed by the parties in an arms-length transaction and is reasonable, we shall award the Doolans prejudgment interest at the rate of 10.76% per annum.

## MOTION OF CCC FOR SUMMARY JUDGMENT

The Stipulation of Facts entered into by the parties details that under the workmen's compensation policies in effect for the Doolan interests for the periods from August 1, 1977 to August 1, 1978 and from August 1, 1978 to August 1, 1979, the insurers could assess retroactive premium adjustments. A number of such assessments were made by the insurers after October 26, 1979 and totalled $148,883.39. DSC finally paid $116,548.88 in settlement of the liability. In a memorandum dated March 17, 1982, Mr. Hueskin, an officer of DSC, requested reimbursement of the workmen's compensation assessments from the Doolans.

There are no genuine issues of fact in the case *sub judice* when the evidence is viewed in the light most favorable to the party opposing the motion.

CCC claims that certain warranties and representations were made by the Doolans at the time of the purchase of the Doolan interests on October 26, 1979, and that as a result the Doolans must reimburse CCC for the insurance expenses paid. CCC specifically points to paragraph 2.6.1 of the purchase agreement which provides:

All assets and liabilities, including but not limited to fixed or contingent liabilities, whether or not required under generally accepted accounting principles to be reflected in financial statements of, and all income and expenses or other

charges relevant to the Doolan Interests are correctly and fully set forth in the Financial Statements or are otherwise described in Exhibit F hereto, or were incurred in the ordinary course of business since May 31, 1979.

Thus, CCC's argument is simply that all liabilities of the Doolans were not correctly and fully set forth in accordance with paragraph 2.6.1. Specifically, CCC claims that the insurance liabilities should have been disclosed in either the financial statements or Exhibit F because the Doolans represented and warranted that all liabilities were correctly and fully set forth, and thus the Doolans intended the financial statements to contain a description of all liabilities which existed at the date of the agreement or which may rise in the future.

CCC claims that it is entitled to full indemnification in the amount of $116,554.88, and cites paragraph 5.2 of the purchase agreement which provides:

Sellers jointly and severally, agree to indemnify and hold harmless CCC from and against, and to reimburse CCC with respect to, any and all loss, damage, liability, cost and expense, including reasonable attorneys' fee, incurred by CCC by reason of or arising out of or in connection with any breach of any covenant, agreement, representation or warranty made by Sellers contained in this agreement or in any certificate or affidavit delivered or to be delivered pursuant to the provisions of this Agreement...."

Further, CCC claims that it has the right to enforce the plaintiffs' warranties and representations according to paragraph 6.3 of the purchase agreement which provides:

[A]ll representations, warranties, covenants and agreements of Sellers shall be deemed to extend to, be for the benefit of, and be enforceable by CCC and Affiliates.

We are unpersuaded by CCC's argument. Attachment "L", which is listed as an exhibit annexed to the agreement of sale, detailed all insurance policies in effect at the time of the sale. CCC claims that the information that the insurance policies

were provided to CCC's counsel cannot be admitted into evidence because such information contradicts the unambiguous terms of the integrated contract.

Specifically, CCC points to paragraph 2.14 of the Purchase Agreement entitled insurance which provides:

> Exhibit L hereto accurately lists and describes all policies of life, fire, liability and other forms of insurance held by the Doolan Corporations or otherwise included in the Doolan Interests. Such policies, or policies of like coverage and amount, will be maintained continuously in force and effect, through the Closing Date.

CCC claims that since this paragraph does not make reference to the fact that the insurance policies were provided to CCC prior to the purchase of the Doolan interests that such fact is inadmissible under the parol evidence rule.

The parol evidence rule, *Restatement of Contracts, 2d*, Sec. 213 provides:

> (1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them.
>
> (2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.

We do not interpret the parol evidence rule to bar the admissibility of the information that the insurance policies were provided to CCC's attorneys prior to the October 26, 1979 purchase. The parol evidence rule only discharges prior agreements to the extent that they are inconsistent with the binding integrated agreement or within its scope. We do not find the providing of the insurance policies to CCC to be an agreement at all. Rather, such information only details the events surrounding the formation of the contract. Therefore, the parol evidence rule is not applicable to the admissibility of this evidence.

■ We therefore find that CCC had all the available knowledge concerning the possibility of the premium assessments prior to the purchase of the Doolan interests on October 26, 1979.

It is common knowledge to businessmen that workmen's compensation insurance policies are frequently reviewed for possible retroactive premium adjustments. Since these policies were known to CCC at the time of the purchase agreement, CCC should have insisted upon an exclusionary clause for any possible retroactive premium adjustments. As the contract entered into was between parties of equal bargaining power, we determine that CCC should have been able to protect itself and hold that the Doolans are not liable to CCC for the retroactive premium assessments.

### ORDER

The motion of Coutinho, Caro & Co., Inc. for summary judgment is DENIED.

The motion of John H. Doolan and Thomas H. Doolan for summary judgment is GRANTED.

Judgment is entered in favor of John H. Doolan and Thomas H. Doolan against Doolan Steel Corporation for the sum of $8,314.29, which represents three (3) months and three (3) days interest, calculated at the rate of 10.76% per annum on the sum of $299,114.37.

IT IS SO ORDERED.